

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed February 5, 2026

_____
United States Bankruptcy Judge
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LaSHAWN MARCINA WILLIAMSON | § | CASE NO. 24-30113-SGJ7 |
|     DEBTOR. | § | (CHAPTER 7) |
| | § | |
| _____ | § | |
| | § | |
| LaSHAWN WILLIAMSON, | § | |
| | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 24-03036 |
| | § | |
| RECOVERY LAW GROUP and | § | |
| NICHOLAS M. WAJDA, | § | |
| | § | |
|     DEFENDANTS. | § | |

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
JUDGMENT [ADDRESSING REQUEST AT DE #53][1]**

---

[1] "DE # ___" refers to the docket number at which items appear on the docket for this Adversary Proceeding.

1

On November 26, 2025, LaShawn Williamson (the "Debtor-Plaintiff"), *pro se*, filed her *Request for Findings of Fact and Conclusions of Law* (the "Request"). The Request relates to a trial held in the above-referenced adversary proceeding ("Adversary Proceeding") on November 17, 2025. The trial dealt with allegations by the Debtor-Plaintiff that Recovery Law Group and Nicholas M. Wajda (the "Defendants"), lawyers who briefly contracted to represent the Debtor-Plaintiff in a future Chapter 7 case, violated the automatic stay of her later-filed bankruptcy case.[2] At trial, the Court delivered an extensive oral bench ruling awarding damages to Debtor-Plaintiff after the Court found the Defendants, indeed, violated the automatic stay. During the bench ruling, the Court awarded Debtor-Plaintiff a total of $12,564.90 in damages, of which $564.90 were actual damages and $12,000 were punitive damages, pursuant to 11 U.S.C. § 362(k)(1). The Court thereafter entered a written Final Judgment.[3] The Debtor-Plaintiff subsequently filed the Request, seeking written findings of fact and conclusions of law. Contemporaneously with the filing of the Request, the Debtor-Plaintiff also filed a *Motion for Reconsideration of Damages Award*.[4] This Court is, on this day, issuing an Order Denying the Motion for Reconsideration. However, this Court will grant this Request to issue written findings and conclusions (to supplement the Court's oral bench ruling).

Rule 7052 of the Federal Rules of Bankruptcy Procedure applies Federal Rules of Civil Procedure Rule 52 to adversary proceedings. These rules provide that courts "must find the facts specially and state its conclusions of law separately" in an action tried on the facts without a jury, like here.[5] The findings and conclusions may be stated on the record after the close of the evidence

---

[2] 11 U.S.C. § 362(a).
[3] *See* DE # 49.
[4] DE # 52.
[5] Fed. R. Civ. P. 52(1).

or may appear in an opinion or a memorandum filed by the court.[6] As mentioned, although the Court delivered an extensive oral bench ruling, the Court is willing to grant Debtor-Plaintiff's Request and provides the following findings of fact and conclusions of law.

## I. JURISDICTION AND VENUE

This Court has jurisdiction to adjudicate this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (G), and (O). The Court has the authority to enter a final order because this is a core proceeding that concerns alleged violations of 11 U.S.C. § 362(a).

## II. THE PARTIES

The Debtor-Plaintiff, LaShawn Marcina Williamson, is a Chapter 7 Debtor who had counsel in her underlying bankruptcy case, and at one time also had counsel in this Adversary Proceeding. In recent months, the Debtor-Plaintiff has been (and is now) acting *pro se* in this Adversary Proceeding. The Debtor-Plaintiff's Chapter 7 case was filed January 12, 2024 ("Petition Date"). The Debtor-Plaintiff obtained her Chapter 7 discharge on April 17, 2024.

The Debtor-Plaintiff was previously represented herein by an attorney named Guy Holman.

The Defendants in this Adversary Proceeding are different attorneys, unrelated to the one (Guy Holman) who filed the Debtor-Plaintiff's underlying bankruptcy case—specifically Nicholas M. Wajda ("Wajda"), who practices under the law firm name of Recovery Law Group, *aka* Wajda & Associates, whose principal office is located at 309 W. 11th Street, Anderson, Indiana, 46016. On a previous occasion in an unrelated case, on June 20, 2022, this Court entered an Order barring Wajda from filing any cases in the Northern District of Texas for 18 months (or, through December 20, 2023).[7] In the Shaub Case, the Court described Defendants, based on the evidence that it had heard, as an "internet-based law firm representing clients in multiple states." The Court uses the

---

[6] *Id.*
[7] *See* Case No. 19-33337-sgj13, DE # 50, pg. 11. This case will be referred to as the "Shaub Case."

3

term "internet-based" law firm to refer to a law firm (at least in the bankruptcy legal realm) that solicits clients through its internet presence or internet-advertising (without regard to where a client is located geographically). The Court heard in the Shaub Case that Wajda is licensed to practice law in California, Nevada, Texas, and Colorado, but he practices primarily in Los Angeles where he lives (and an Indiana address has been used for Defendants in this case). In the Shaub Case, the Court determined that "Nicholas Wajda's sloppy protocols, lack of reasonable care, and subsequent failure to disclose the fraud to the court upon discovering it substantially contributed to the perpetration of [a] fraud" and that Wajda's actions in that case "violated 11 U.S.C. §§ 526(a)(2), 527(b), and 528(a); Fed. R. Bankr. Pro. 1008 and 9011; and Tex. Disciplinary R. Prof. Conduct 1.01(b), 1.02(c), 1.03(b), and 3.03."[8] The Court barred Wajda from filing any new bankruptcy cases in the Northern District of Texas in connection with the Shaub Case on June 20, 2022, for a period of 18 months (again, through December 20, 2023).[9] Prior to the Shaub Case, this Court also disciplined Wajda in yet another case for significant problems, requiring him to disgorge fees and prohibiting him from his regular use of "appearance counsel" in this district without strict adherence to certain procedures.[10] Separately, Wajda agreed with the State Bar of Texas to a probated sentence prohibiting him from practicing law in the State of Texas from March 1, 2023 through August 31, 2023.[11]

### III. FINDINGS OF FACT

On November 15, 2023—approximately two months before ultimately filing bankruptcy—the Debtor-Plaintiff reached out to the Defendants about filing a personal bankruptcy case. The

---

[8] *See* the Shaub Case, DE # 50, pg. 10.
[9] *See* DE # 45, Exh. 4.
[10] *See In re Pearson*, 2020 WL 1845048 (Bankr. N.D. Tex. Apr. 9, 2020); *See also* Case No. 20-30077, DE # 71 (the "Pearson Case").
[11] *See* DE # 45, Exh. 6.

Debtor-Plaintiff entered into a "Chapter 7 Retainer Agreement" (the "Retainer Agreement" or "Agreement") with Defendants. The Agreement was signed electronically in Dropbox by Debtor-Plaintiff and Wajda.[12] In the Agreement, Debtor-Plaintiff agreed to pay a flat fee of $1,950 for the Defendants to represent her in a Chapter 7 case (plus, perhaps, another $350 for "Consumer Protection" consultation services). The Agreement included a clause authorizing automatic payments in the event services were terminated prior to full payment. The Court notes that this Agreement was entered into at a time when Wajda was barred from filing bankruptcy cases in the Northern District of Texas (i.e., approximately one month before his bar order expired). However, there were other attorneys at the Defendants' firm admitted to practice in Northern District of Texas at the time of the Agreement: Michael T. Reid, David Cain, and Carlos C. Alsina-Batista.[13]

In any event, just a couple of weeks later, on Thursday, November 30, 2023, Debtor-Plaintiff notified Defendants (i.e., Wajda personally, via email) that she had decided that she would not be proceeding with Defendants' legal representation of her at that time and that she had decided to explore alternative options (without saying what).[14] This email was sent at 1:58 pm. The Court finds this to have been a termination of the Agreement.

The Debtor-Plaintiff produced a text message dated November 30, 2023, at 2:42 pm, reflecting that Defendants received the email and wanted to talk to Debtor-Plaintiff about what was going on.[15] Then, on December 4, 2024, the Defendants sent Debtor-Plaintiff an email indicating that Defendants were experts in non-bankruptcy consumer protection laws.[16]

---

[12] *See id.* at Exh. 1.
[13] *See id.* at Exh. 2.
[14] *See* Debtor-Plaintiff's Complaint, DE # 1, Exh. D-1.
[15] *See* DE # 27, pg. 11.
[16] *Id.* at pg. 13.

5

A few weeks later, on January 12, 2024, Debtor-Plaintiff commenced the above-styled Chapter 7 bankruptcy case ("Bankruptcy Case"), represented by attorney Guy Holman.

Together with the voluntary petition, Debtor-Plaintiff filed Schedules E/F which listed the claim of Defendants as unsecured in the amount of $2,995.[17]

On or about January 18, 2024, the bankruptcy clerk sent the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors and Deadlines ("341 Notice") to all creditors, including Defendants based on the Mailing Matrix, which constituted formal notice to Defendants of the Bankruptcy Case. True and correct copies of the 341 Notice and Certificate of Service were attached to the Complaint as Exhibit B.

The Defendants had actual knowledge of Plaintiff's Chapter 7 bankruptcy filing. Nevertheless, Defendants engaged in debt collection actions against Debtor after receiving notice that the Debtor filed for bankruptcy protection ***by attempting to draw payments for their Retainer Agreement against the Debtor-Plaintiff's bank account***. This is undisputed.

It is also undisputed that the draw-attempts yielded no payments. The Debtor-Plaintiff received emails about these payment-failures (six times—four of which were attempted and communicated to the Debtor-Plaintiff post-petition) on December 1, 2023 (prepetition), January 1, 2024 (prepetition), February 1, 2024 (postpetition), March 1, 2024 (postpetition), April 1, 2024 (postpetition), and May 1, 2024 (postpetition).[18] The Debtor-Plaintiff received her discharge on April 17, 2024. Defendants received notice of it.[19] The Debtor-Plaintiff filed this Adversary Proceeding in May 2024.

---

[17] *See* DE # 1, Exh. A.
[18] *See* DE # 27, pp. 15–20.
[19] *See id.* at pg. 35.

Defendants argue that the draw-attempts were all automated activities, and attorneys at their firm, including Wajda, do not have control over the firm's automated payment system. Thus, communications directed to individual attorneys, such as the Debtor-Plaintiff's email to Wajda on November 30, 2023, would not alter or terminate any scheduled payments. Wajda did not appear at trial to testify to this under oath.

To be clear, after Debtor-Plaintiff filed her Chapter 7 bankruptcy petition, Defendants' internal systems sent four automatic withdrawal attempts to Debtor-Plaintiff's bank account on file. All four attempts were returned showing a payment withdrawal would fail as the account was either closed or not working. No funds were ever withdrawn from Debtor-Plaintiff's account following the bankruptcy filing. Debtor-Plaintiff never made a single payment to Defendants for legal services.

The Defendants argue that the failed withdrawal attempts referenced in the Complaint were generated by the prepetition automated billing schedule and were not willful or intentional acts to collect a debt, as Defendants were unaware the Debtor-Plaintiff had filed a bankruptcy case with another attorney. As noted, Wajda did not testify at the trial, but the attorney that did appear made these representations as a lawyer.

There was not much evidence on the Debtor-Plaintiffs' part either. Debtor-Plaintiff does not dispute that the Defendants did not withdraw any funds from her bank account. She has presented no documentary evidence of any bank records that reveal any overdraft charges or any other economic impact of the attempted payment draws. The Debtor-Plaintiff did not miss time from a job. The Debtor-Plaintiff did not have evidence of attorneys' fees incurred, since she parted ways with Mr. Holman shortly after this Adversary Proceeding was filed.

The Debtor-Plaintiff asserts that she has been injured and damaged by Defendants' actions and is entitled to recover judgment against Defendants for actual damages in an amount not less than $50,000.00, and punitive damages in an amount not less than $50,000.00, plus an award of costs and reasonable attorney's fees, for violations of 11 U.S.C. § 362, and pursuant to the Court's powers under 11 U.S.C. § 105.

## IV.  LEGAL CONCLUSIONS

Again, a total of four postpetition automatic stay violations occurred here. Although unsuccessful, the payment withdrawal attempts were collection attempts on a prepetition claim.[20] These were done at a time Defendants had received notice of the Debtor-Plaintiff's Chapter 7 bankruptcy filing. Notably, it is also interesting (to put it mildly) that the Defendants did not represent the Debtor-Plaintiff in ***any*** bankruptcy case and there is no evidence that they actually did any work for her, other than an initial consultation and signing her up to the Retainer Agreement.

To analyze whether damages are appropriate for the stay violation, we turn to section 362(k) of the Bankruptcy Code. It permits "an individual injured by any willful violation of [the automatic] stay" to recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, [a harmed individual] may recover punitive damages."[21]

The first legal question is what is a "willful" violation of the automatic stay? Does section 362(k) require specific intent to violate the stay or only an intent to commit the act which violated the automatic stay? Courts have held that a "willful violation of a stay" pursuant to section 362(k) "does not require a specific intent to violate the automatic stay."[22] Instead, the Fifth Circuit has

---

[20] *See* 11 U.S.C. § 362(a)(6).
[21] 11 U.S.C. § 362(k)(1).
[22] *In re Chestnut*, 422 F.3d 298, 302 (5th Cir. 2005).

ruled that a "willful" violation of the automatic stay means "acting with knowledge of the stay."[23] Note that while specific intent to violate the stay is not required, knowledge before acting is.[24] Therefore, to establish liability for a claim under section 362(k), a debtor must show that: (1) the creditor knew of the existence of the stay; (2) the creditor's acts were intentional; and (3) the creditor's acts violated the stay.[25]

Here, the evidence was that the Defendants received notice of the bankruptcy case and, thus, notice of the stay. The collection acts were a violation of the stay—even though no funds were actually deducted. The Court has no evidence as to whether, in these particular circumstances, the notifications could have been stopped. There is evidence that Wajda received a communication November 30, 2023, that the Debtor-Plaintiff did not seek to go forward with his representation. And all we know is there was a failure on the part of the firm to stop what appears to have been automated notifications.[26] Thus, with no evidence from Wajda or the firm to the contrary, this Court concludes that this should be deemed a situation where the acts were intentional. Defendants cannot blame acts on their automated computer programs to escape accountability.

What about damages? Here, no funds were actually withdrawn and no fees or charges were assessed against the Debtor-Plaintiff's account. Debtor-Plaintiff's only evidence of actual damages is her testimony of emotional distress suffered, with copies of medical records (for therapy visits and medications).[27] The Court would not admit certain "community affidavits" of acquaintances that purported to testify regarding the Debtor-Plaintiff's emotional distress. This was hearsay. In

---

[23] *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008).
[24] *Id.*
[25] *See In re Repine*, 536 F.3d 512, 519 (5th Cir. 2008).
[26] *See In re Holder*, 356 B.R. 184, 189–90 (Bankr. S.D. Tex. 2006), *aff'd*, 376 B.R. 802 (S.D. Tex. 2007) (Holding no willful violation of the stay occurred when evidence showed an outsourced automated billing process was "virtually impossible to override.") As noted above, there was no evidence in this Adversary Proceeding as to the ability or not to override.
[27] *See* DE # 43, Exhs. F, G, and H.

9

any event, the Debtor-Plaintiff represented that she has had other sources of stress in her life—as a Veteran and as a consequence of previously living with a former spouse who was a Veteran and ill—and she was already receiving mental health services prior to the stay violations. It made it hard for the Court to evaluate which medical invoices relating to emotional distress could be attributable to automatic stay violations. The Debtor-Plaintiff also presented invoices regarding damages incurred in a car wreck driving to court in her BMW, which she argues would not have occurred but for her having to travel to court and deal with this litigation.[28]

The Fifth Circuit has adopted a heightened standard for granting emotional damage awards under section 362(k), which requires that the emotional injury be "linked to some other financial injury" and that any asserted emotional damages be "supported by 'specific information' rather than 'generalized assertions.'"[29] Here, the Court believes it is reasonable to conclude that some of the Debtor-Plaintiff's stress was related to this lawsuit and the underlying facts. The Court has determined that $564.90 of Debtor-Plaintiff's medical bills should be attributed to emotional distress regarding the stay violations. With regard to the BMW car wreck, the Court cannot conclude causation was established to determine the damages related thereto were sufficiently connected to stay violations.

The next legal question is, once section 362(k) is triggered, may a court award punitive damages in the absence of actual damages (or if there is very little in the way of actual damages)? The statute states that punitive damages may only be awarded "in appropriate circumstances."[30] The Fifth Circuit has ruled that this requires "egregious conduct" on the part of a creditor.[31] As an example, the Fifth Circuit once found that a creditor violated the automatic stay with "egregious

---

[28] *See id.* at Exh. N.
[29] *See Repine*, 536 F.3d at 521 (quoting *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 879–80 (7th Cir. 2001)).
[30] 11 U.S.C. § 362(k)(1).
[31] *Matter of Monge*, 826 F.3d 250, 256 (5th Cir. 2016).

conduct" when it ignored the debtor's warnings of the violations, failed to appear before the court in defiance of an order, and persisted in its efforts to collect fees despite the court's admonishments.[32] "Conduct warranting punitive [damages] typically involves a violator with knowledge of the bankruptcy to have done one or more of the following: (i) repeatedly ignored requests to maintain the status quo of or to relinquish estate property; (ii) converted estate property via sale or destruction; (iii) taken steps to cover-up their violation; or (iv) ignored or frustrated the stay violation proceeding."[33] Here, there was no evidence as to follow up actions on the part of the Debtor-Plaintiff to stop the notifications by the Defendants (and no evidence of defiance by Defendants in the face of that). There was certainly no evidence of conversion of estate property or a cover up. However, the Court concludes that there were a couple of things that were egregious here: (1) it was a ***consumer debtors bankruptcy law firm that undertook the automatic stay violations***; (2) Wajda never mentioned to the Debtor-Plaintiff that he was personally barred from filing a case in the Northern District of Texas at the time he agreed to represent her and that, depending upon the timing of the filing, it would have to be others at the firm, not him, handling her case; (3) it appears highly questionable that there was even a valid claim to collect (there was no evidence that Defendants actually did any work for Debtor-Plaintiff); and (4) Wajda did not appear for the trial or *ever* in this Adversary Proceeding to explain himself. His lawyer/colleague admits that these payment-attempts were stay violations and that this is all quite embarrassing for a consumer debtor law firm. Embarrassing indeed. And, under all the facts and circumstances, a little egregious. For these reasons, the Court has imposed punitive damages equal to $3,000 per stay violation (of which there were four) for a total of $12,000 of total punitive damages.

### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

---

[32] *See Repine*, 536 F.3d at 521.
[33] *In re Hernandez*, No. 23-31322, 2025 WL 1248423 at *6 (Bankr. W.D. Tex. Apr. 29, 2025) (citations omitted).